LEIGH M. CLARK, Retired Circuit Judge.
A jury found this appellant guilty of attempted murder as charged in an indictment reading in pertinent part as follows:
“Lee Anton Shassere, Jr., ... did, with the intent to commit the crime of murder attempt to commit said offense by pointing a loaded pistol at Tom Wimberly and pulling the trigger thereby attempting to fire said pistol.”
Alabama Criminal Code, § 13A-4-2(a) provides:
“A person is guilty of an attempt to commit a crime if, with the intent to commit a specific offense, he does any overt act towards the commission of such offense.”
Section 13A-4-2(d)(l) provides that an attempt is a Class A felony if the offense attempted is murder. The trial court sentenced defendant to imprisonment for 15 years. The minimum time of imprisonment for a conviction of a Class A felony is 10 years. § 13A-5-6(a)(l).
According to the undisputed evidence, the incident that furnished the basis for the alleged crime occurred on the night of December 29-30, 1980. The alleged victim and Deputy Sheriff Dale Holley were both deputy sheriffs for Colbert County. They testified that while they were on patrol that night soon after midnight they saw a motor truck, weaving around the road. Deputy Holley testified:
“All right, we stopped the car [the patrol car] and Tom went to the driver’s side and I, being as I was riding on the passenger’s side, I always go to the other side to watch that door, and got up to the *193 truck and noticed that the driver had been drinking. So we asked him to step out and I watched the other subject to make sure, you know, that nothing happened as far as the passenger in the truck’s part. And then I asked the passenger to step out and we went around to the pavement side of the road to get away from the ditch.”
Soon thereafter, the driver of the truck, who was identified as the defendant Shas-sere, and a passenger in the truck, whose name is Simmie Black, were directed to get in the patrol car with Officer Wimberly, who drove the car to the Muscle Shoals Police Department while Officer Holley was driving there in the truck. Defendant was subjected to breath analysis tests. Soon thereafter, the defendant, having been arrested for driving under the influence of intoxicating liquor, was transported in the patrol car by Officer Wimberly to the Colbert County Jail in Tuscumbia. In the automobile with them was Simmie Black. Officer Holley followed them in the truck.
During substantially all of the time of the circumstances narrated above, Officers Holley and Wimberly were in radio contact with Officer Irving Hargett, Jr., who was the night shift jailer at the Colbert County Jail. Officer Hargett testified that he saw the patrol car drive up, Officer Wimberly get out and open the door for Shassere and that Shassere had a pistol “in his hand, gripped,” that there was some commotion in or about the patrol car, and then an officer or the officers escorted defendant into the jail, where he was booked. The witness said that while defendant was in the jail, the defendant made a statement as follows:
“The statement was such that the defendant made to Officer Wimberly that he either intended — thoroughly intended to kill him or he thoroughly intended to shoot him; I don’t remember, it’s not too clear.”
On cross-examination, the witness testified that he was standing about ten feet from the defendant at the time the defendant got out of the automobile with a pistol in his hand. Upon being asked whether he heard a revolver click at that time, he said, “I don’t recall.” Defense counsel clicked a revolver while about twenty-five feet from the witness, which the witness stated he heard. He further testified that “during the commotion and everything, no, sir, I did not hear a gun click.”
During the lengthy testimony of Deputy Sheriff Wimberly, he testified:
“So we went to Muscle Shoals and ran the P.E.I. test, and the result of the test was .19. We left there and went to our jail, when I got to the jail, I pulled up and got out of the car, opened the door and told Mr. Shassere, said, to get out. And he sat there, and I said, Lee, don’t make me get you out of the car. At that point, he turned and put his feet on the ground and his hands were out of my sight for a moment — like this — and the next thing, he came up and he had a pistol. He was pointing at me and he said, You s.o.b., I’ll shoot you. Then I drew my revolver and had it on him, the gun — his pistol snapped and I grabbed his wrist and pushed it away from me and put my pistol back up, we wrestled around on the back of the patrol car; I had him down on the back of the patrol car and put my arm across his throat and got the pistol away from him. I pitched it to Dale [Officer Holley] and he came walking up — or running up; I pitched the pistol to Dale, and still the scuffle going on and we fell into the door and got him on the inside of the booking room. And as they have stated, things kind of calmed down a little bit; I was nervous, mad, I guess the whole bit. And that’s when the statement was made; we were standing just inside the door that — as we were wrestling on the trunk lid of the car, I had my arm across his throat, my hand holding that pistol away from my body, and he said something, you m.f. I’ll kill you. And after we got on the inside, he told me, said, I’m probably going to make you mad, but that’s the first time in four years my gun has misfired. And he said, I fully intended to shoot you.
*194 And we booked him in, charged him with Driving While Intoxicated, and I don’t know, there were several charges that were brought — Driving While Intoxicated, No Driver’s License — but at the time he made these statements there were no questions asked.”
Under the caption, “APPELLANT WAS NOT INFORMED OF HIS MIRANDA WARNING,” it is contended in appellant’s brief, “Thusly statements made by Appellant, ‘that’s the first time in four years the gun never went off,’ ... and five to 15 minutes later a statement ‘I intended to shoot the deputy’ are inadmissible and not res gestae.” In the portion of appellant’s brief just quoted he refers to a portion of the testimony of Officer Wimberly as to defendant’s statements of an incriminating nature to the effect that he intended to kill Officer Wimberly. It has been repeatedly held that the requirement of Miranda warnings is not applicable to spontaneous statements of an accused under circumstances similar to those presented in the instant case.
“A spontaneous statement, blurted out by the accused and volunteered to a police officer prior to any questioning, is admissible against him even though he was not given the Miranda warnings. “Hammons v. State, 371 So.2d 986 (Ala.Cr.App.1979; Espy v. State, 365 So.2d 356 (Ala.Cr.App.1978).” Ervin v. State, Ala.Cr.App., 399 So.2d 894, 897 (1981).
We disagree with appellant’s contention that the incriminating statements of defendant were not properly admitted in evidence.
In the next contention for a reversal in appellant’s brief, he challenges the admission in evidence of State’s Exhibit # 1. The exhibit consisted of an unloaded pistol, which was offered by the State as the pistol in the hand of defendant at the time he was leaving the patrol ear at the Colbert County Jail. The exhibit was offered and received in evidence during the testimony of Officer Holley, who had testified that it was the same pistol that Officer Wimberly had taken from defendant and had thrown to Officer Holley and that it was “in reasonably and substantially in the same condition as it was when you [he] received it on the morning of December 29, 1980,” except for the fact that it was not loaded at the time it was offered and admitted in evidence. Appellant continues the complaint that he made on the trial that the witness identified it partly by the serial number thereof and that the witness was relying on notes made by Officer Wimberly, rather than Officer Holley, as to the serial number. Appellant argues therefrom that such testimony constituted hearsay evidence, and to some extent some of the particular testimony can be classified as hearsay, but on the whole we are of the opinion that the pistol was properly identified by Officer Holley as the weapon in the hand of defendant as he emerged from the patrol car at the Colbert County Jail. The trial court was not in error in overruling defendant’s objection to the offer in evidence by the State of State’s Exhibit # 1.
For a better understanding of our discussion of other issues presented by appellant, we deem it appropriate at this time to summarize the evidence presented by defendant. The only witness called by defendant to testify as to any of the facts and circumstances of the alleged crime was the defendant himself, with the possible exception that the defense called Deputy Sheriff Earl Harbor, who testified briefly, chiefly on voir dire out of the presence of the jury, as to the partition between the front seat and the rear seat of patrol cars of the Sheriff's Department of Colbert County, which is not involved in any issue on appeal. The only other witnesses for the defense were five character witnesses, two from Memphis, Tennessee, where defendant lived and three from north Alabama, all seemingly well known and highly regarded, who testified unstintingly as to defendant’s good general reputation and to his good reputation for truth and veracity and peaceableness and non-violence. The defendant testified steadfastly that he did not pull the trigger of the pistol. He said he *195 had owned the pistol for a long time, that he had it with him in the truck at the time he was apprehended by the officers and transferred to the patrol ear, that he became greatly concerned about his having the pistol in his coat in the rear seat of the patrol car. He testified loquaciously as to what occurred at the time of his arrival in the patrol car at the jail, including the following:
“Well, could I go back just a little to tell you what happened inside the car — Mr. Wimberly opened the car door and said, Lee, get out, we are going to be here about six hours or something like that. And I said, well, all right, and I patted myself on the leg like that, and when I did, I felt this gun in my pocket. It kind of shocked me, you know, I had forgot that I had the thing in there, and I pulled it out and I showed it to Simmie, and he’s sitting there, and his eyes got big — he got bug eyed, you know — and I looked over to him — I’m always playing tricks on him, you know. I said, here you boys want a gun, just take this, here’s a good chance, you know. And he started saying oh, boss, don’t make me take that gun — he didn’t want it. And I said, well, isn’t this a fine thing, so I said, I guess I’ll have to give it to the policeman over there. And he said that’s a good idea, give it to him. So I stepped out of the patrol car and held the gun up in the air — held it up in this fashion and I walked toward the policeman, and I said, hey, I think you’d better take this — some words in that manner like that. And as I stepped about two steps toward him, he grabbed me and threw me back on the trunk of the car and started banging the gun against the window of the patrol car on the trunk. And Simmie Black was looking out at me and his eyes were looking like that, you know, that gun— everytime it hit the window, well, he just — so he ducked, he hit the floor. And Officer Wimberly got the gun away from me and walked me this way. Well, as I said, just as I got out of the car, I saw this flashing light and when Officer Wimberly took me over three or four steps away from the patrol car and Mr. Holley, he came around and he had his arms loaded down with guns and cans and more guns and things like that [the reference is to rifles and other articles in the truck defendant was driving]. And he sat them down and he ran over and said, what’s the trouble, what’s the problem. And Tom here said, this man tried to shoot me, something like that. And Tom pushed me back and — Holley pushed me back and he said, turn around and face that door, which would be the glass door leading into the jail house— the outside door. And I moved a little bit too slow to suit him, and he hauled off and gave me a shove, shoved— pushed me right into that glass door; it just caved it in, just crushed the entire door.”
“Q. All right, now let me go back just a minute — do you remember if, at any time, just before Tom Wimberly jumped at you or jumped at your hand or took the gun away from you, did you ever have the gun breeched as it is now breeched?
“A. I believe I did, yes, sir, when I stepped out of the patrol car in order to make sure he didn’t think I was going to shoot him, I had it up like this. Now before I got to him, he being a tall man now, he was up like that, and it was dark, I think I closed it like that. In fact, I believe I said the words to him, I’ve got the breech open — I said the breech is open. And then when I got up to him, I just went and closed the breech and gave him the gun. And that’s when he said, son of a b ...
“Q. All right, did you ever pull that trigger?
“A. No.
“Q. All right—
“A. No, before you pull the trigger, you’ve got to pull back on the hammer. “Q. You’ve got to pull the hammer back first?
“A. Yes, sir, that’s right.
*196 “Q. Well, I didn’t hear Mr. Wimberly say anything about whether the hammer was pulled back or not — was it pulled back, as far as you know? “A. No.”
The defendant proceeded to testify that in the pistol at the time was a live bullet, the bullet that had been introduced by the State as State’s Exhibit 2, a bullet that had on it the indentation of the firing pin of the pistol. In explanation thereof, defendant testified that this indentation had been made by defendant in July or August of 1980 when he pulled the trigger to shoot at a snake and the “gun snapped” without a discharge.
By another issue presented in appellant’s brief, it is contended that the trial court erroneously admitted in evidence, on cross-examination of defendant’s character witnesses, testimony to the effect that defendant had been guilty recently of criminal conduct other than the specific criminal conduct charged in the instant case. Some questions along this line were directed to each of the five character witnesses. A complete recital of all of the testimony in this particular respect, covering twenty or thirty pages of the transcript, would be unnecessary and inappropriate in this opinion, we think. We now recite a large part. We include an inquiry addressed on cross-examination to Mrs. Taylor, one of defendant’s character witnesses, in which are included the pertinent remarks of counsel and the rulings of the trial court:
“MR. PATTON [District Attorney]: May I proceed?
“BY THE COURT: Yes, sir, go ahead.
“MR. PATTON CONTINUES: Mrs. Taylor, you testified that you knew the defendant and you knew him up until this time, is that correct?
“A. Yes, sir.
“Q. And you knew he was of good character?
“A. Yes, sir.
“Q. Were you familiar with the fact that on the 29th of December, 1980, when he was arrested in Colbert County, Alabama, he was in possession of two weapons that were stolen in Memphis in 1978?
“A. Yes, sir.
“MR. GRAHAM [One of defendant’s two attorneys on the trial]: Just a minute, now we move for a mistrial; that has nothing to do with the issues involved in this case, there has been no charge made against him of possession of stolen instruments, there has been nothing proven in this case of any such thing. As far as we are concerned, that’s just an assertion for the benefit of prejudicing the minds of the jury. It’s illegal, the proper predicate is not laid, there is no connection between what he is saying and any evidence before this jury at this time at all. It is calculated to prejudice and inflame this jury against this man by prejudicial matters and we move for a mistrial; and ask that the Court, at this time, grant a mistrial.
“BY THE COURT: Okay, the Court denies your motion for a mistrial as you’ve placed the character of the defendant before the Court, and the District Attorney has a right to cross-examine on the character and reputation of the defendant.
“MR. UNDERWOOD [Defendant’s other trial attorney]: Judge, we would ask that he not bring up those matters simply because the Sheriff's Department investigated those guns and no charges were filed against Mr. Shassere, but they came up with an explanation—
“MR. GRAHAM: No charges at all against him, is just an assertion, that’s all.
“MR. PATTON: If it please the Court—
“BY THE COURT: I overruled the motion.
“MR. GRAHAM: Well, our next motion would be that the jury, if Your Honor please, be instructed by the Honorable Court to disregard that, and to admonish the State’s prosecutor to not ask any more such questions unless there is some foundation or basis for it, because as the record shows, there is no testimony about that at all; there’s no charge being made against this man for anything. And actually there *197 was nothing to charge him about, it’s just thrown out here for the jury’s consideration, but was no basis to it, and on that ground, we would ask the Court to instruct the jury not to consider this.
“BY THE COURT: The motion is denied.
“MR. GRAHAM: We respectfully except to the Court’s ruling.
“MR. PATTON: You may answer the question I asked you.
“A. What?
“Q. Did you know he was in possession of two weapons that were stolen in Memphis in a burglary?
“A. No, I didn’t.
“MR. GRAHAM: Wait a minute, I want to object to this on the same grounds assigned. Your answer was no.
“A. Correct.
“MR. PATTON CONTINUES: Were you familiar with the fact that on the occasion when he was arrested that he was in possession of marijuana?
“MR. GRAHAM: We object to this, it’s not so, it’s illegal, irrelevant and immaterial.
“MR. PATTON: Now, wait just a minute—
“MR. GRAHAM: There’s no testimony in this case, there’s no charge made; I assume if he had been in possession of it, charges would have been made. There’s no evidence at all up to this point that we’ve had the right to rebut or explain about any marijuana. So again, it’s just calculated to prejudice the minds of the jury and we ask for a mistrial.
“BY THE COURT: Overrule the motion.
“MR. GRAHAM: We ask that the Court instruct the jury to disregard this question since there is no evidence of any such thing. He’s just asking questions out of the clear air here. There’s no testimony in the record to that effect, no charge is made against this man. And on that basis it is denying him the right to due process of law to a fair and impartial trial.
“BY THE COURT: The motion is overruled.
“MR. GRAHAM: We except.
“MR. PATTON CONTINUES: Were you aware of that?
“A. No.
“MR. GRAHAM: Now we respectfully move that it be stricken. She doesn’t know any such thing. She has answered both questions in the negative and he goes on and talks about these things. There is no testimony about it at all and it’s nothing more than just trying to prejudice the minds of the jury against defendant.
“BY THE COURT: Overrule the motion.
“MR. GRAHAM: We except.
“MR. PATTON CONTINUES: Would the fact he was in possession of two weapons that were stolen in Memphis some time prior to that, the fact that he was in possession of marijuana on this occasion, would this in any way change your mind about his good reputation if that was true?
“MR. UNDERWOOD: Your Honor, we would object on the ground that there hasn’t been any testimony introduced of this fact.
“MR. PATTON: I want to approach the bench.
“(At this time the attorneys approached the bench).
“MR. GRAHAM: We move for a mistrial on the ground that the statements that he’s making are based on — some of them are not founded at all on any kind of testimony, no charge having been made, and if there is any pending investigation, there has been certainly no conviction on any of these things, and it’s calculated just to prejudice the minds of the jury against this defendant, who is here on one specific charge and no others. On that basis, we ask for a mistrial.
“BY THE COURT: Mr. Graham, you placed the defendant’s character and reputation before the Court with your witness and this is cross-examination; and the Court denies your motion.
*198 “MR. GRAHAM: We respectfully move the Court to instruct the jury not to consider it, because it’s not a part of this case, he’s not been charged with anything, and there’s been no evidence in this case against this defendant for any such allegations, and as such, it’s denying him of a fair trial and due process of law.
“BY THE COURT: The motion is denied.
“MR. GRAHAM: We respectfully except to the Court’s ruling.
“MR. PATTON CONTINUES: Mrs. Taylor, do you recall my question?
“A. Not all of it after all the confusion, no.
“Q. All right, would the fact, if it was a fact, that the defendant was in possession of two weapons that were stolen in a burglary in Memphis, and further — on December 29th, the two weapons — and further that he was in possession of marijuana on this occasion, would this in any way affect your opinion as to his good character if you’d known that?
“MR. GRAHAM: We object on the same grounds assigned.
“A. No.
“BY THE COURT: Overruled.
“MR. PATTON CONTINUES: You would still be of the same opinion that he was a man of good character even if he was carrying marijuana and stolen goods?
“MR. GRAHAM: Now if Your Honor please, he is not asking the question correctly. We didn’t ask anything about a man of character, we asked about a man’s reputation. A reputation is different technically, and in substance, from what a man’s actual character is. We asked this lady about what his general reputation was, and that’s what the law requires us to ask — what a man’s general reputation is in the community where he lives. And on that basis, in addition to the other grounds assigned, we object to the question.
“BY THE COURT: The objection is overruled.
“MR. GRAHAM: We except.
“MR. PATTON CONTINUES: You may answer the question.
“A. I said, no, it wouldn’t change my mind about him.
“Q. The fact that he had stolen merchandise, the fact that he had marijuana—
“MR. GRAHAM: Now if Your Honor please, he is repeating the same thing over and over.
“BY THE COURT: Sustain the objection, repetitious.
“MR. PATTON: This is cross-examination, if it please the Court.
“BY THE COURT: You’ve already asked her that, let's move on.
“MR. PATTON CONTINUES: Okay, so then you are of the opinion that people that have stolen merchandise are people of good character, is that correct?
“A. Not necessarily, no. He may not have known it was stolen, I don’t know that.
“Q. What if he knew it was stolen—
“MR. GRAHAM: We object, there is no evidence that there was ever any property taken off this man where he knew it was stolen; no evidence at all in this case, and it’s repetitious and argumentative. She has answered the question and respectfully objects to the question as asked.
“BY THE COURT: Overruled, let’s move on.
“MR. GRAHAM: We except.
“MR. PATTON CONTINUES: Do you recall my question — what if he knew that it was stolen property, or had reason to believe it was stolen — would this in any way affect your opinion?
“MR. GRAHAM: We object because there is no evidence — a hypothetical question, and there is no evidence to make that a part of the hypothesis.
“BY THE COURT: Cross-examination.
“MR. GRAHAM: Well, they have to be properly hypothecated [sic], if Your Honor please. There’s no evidence in the case— he said, if the man knew, or if he’s stole a horse. There’s no evidence that he ever *199 stole a horse — that if he knew anything was stolen.
“BY THE COURT: Objection is overruled.
“MR. GRAHAM: We except.
“BY THE COURT: You may answer the question.
“A. No, it wouldn’t change my mind about him.
“MR. PATTON: All right, I believe that’s all.
“RE-DIRECT EXAMINATION”
We do not question Mrs. Taylor’s asserted inability to remember all of the question that had been asked her on cross-examination “by reason of all the confusion” that she apparently attributed to the torrential protests of counsel for defendant to the efforts of counsel for the State to show criminal conduct on the part of the defendant other than that for which he was being tried, and the trial court could have understandably been hindered thereby from correctly assaying the basic reason for the protest against the inquiry. Such profusion of language was neither necessary nor helpful. Nevertheless, it is to be discerned from the lengthy portion of the transcript just quoted that defendant’s protest was grounded on the exclusionary rule that “forbids the State to prove the accused’s bad character by particular deeds.” Gamble, McElroy’s Alabama Evidence, § 69.-01(1) (1977). There is no contention by appellee that the inquiry comes with any exception to the general rule of exclusion. Appellee captions its countercontention to the issues presented by appellant now under consideration as follows:
“WHETHER APPELLANT PROPERLY PRESERVED ERROR CONCERNING OBJECTIONS RAISED AT TRIAL? NO.”
We agree, as already indicated, that valid grounds of objection by defendant’s attorneys were obscured greatly by verbal profusion, but we do not agree that no valid ground is to be found for the position taken by defendant’s counsel as to the inadmissibility of the testimony as to other crimes or misdeeds by defendant. We also disagree with the trial court’s rulings on the point, except the ruling denying defendant’s motion for a mistrial, which we find is unnecessary to determine. In cross-examining some of the other character witnesses, they were also asked questions predicated upon a notion or assumption that defendant had been guilty of possessing stolen property. The following occurred at the commencement of the cross-examination of one of the character witnesses:
“BY MR. PATTON:
“Q. Dr. Gaisser, would the fact that — if it was a fact that on December 29, 1980, defendant was in possession of property that was stolen in a burglary in Memphis, Tennessee, knowing or having reason to believe that that property was stolen, would that in any way affect you about his reputation — if he knew that he did those things?
“MR. UNDERWOOD: We object on the grounds Mr. Graham annunciated earlier in the proceedings.
“BY THE COURT: Anything else?
“MR. UNDERWOOD: And if the Court would so, we would just lodge that objection everytime that the District Attorney makes these comments and assign the same grounds so we don’t have to go through with it over again. Is that all right with the Court?
“BY THE COURT: That’s fine.
“MR. UNDERWOOD: Okay, we object. “MR. GRAHAM: That’s what we assign, and we object.
“BY THE COURT: The Court does overrule the objection.
“MR. GRAHAM: We except.
“A. Nothing would shake my confidence in Lee Shassere. And I don’t believe that he would steal things. I can imagine stolen things maybe being in his vehicle, but he may not be the one who put them there. I have every confidence in this man’s character.
“Q. All right, sir, so we understand one another — that he knew was stolen or had *200 grounds to believe it was stolen and that he had it in his possession?
“MR. GRAHAM: Now we will respectfully object to that, strenuously object to it. There is no evidence in this Court or in any other court that I know of or have ever heard of that this man had property in his possession that he knew was stolen or had reason to believe that it was stolen. And the question is a hypothetical question, but the hypothesis hasn’t been proven. Therefore, the question is illegal, this is just a statement by Mr. Patton; there are no charges on him for any such thing, there has been no evidence in this case before this jury of any such thing, they are unfounded and the statement that he is propounding here, Dr. Gaisser is not supported by evidence in this case, and it is for no other purpose than to prejudice the minds of the jury. “BY THE COURT: The objection is overruled.
“MR. GRAHAM: We except.
“A. Well, I would have to repeat what I said — if Mr. Shassere knew they were stolen, I’d have every confidence that he had some good reason, some legitimate reason for having it there.
“MR. PATTON CONTINUES: All right, would the fact, if it were a fact that he had known at this time that he had illegal drugs, to-wit: marijuana in his possession at that time, would that in any way affect your opinion as to his reputation and his character?
“MR. GRAHAM: We object on the same grounds heretofore assigned on the other related question.
“BY THE COURT: The objection is overruled.
“MR. GRAHAM: We except.
“A. Well, I think I know Mr. Shassere well enough that nothing would impair my confidence in him or his veracity or the liability. There would be some acceptable explanation for his being in that circumstance, in my opinion.
“MR. PATTON CONTINUES: All right, sir, ten rolled cigarettes in his shirt pocket?
“MR. GRAHAM: Now if Your Honor please, we object to this, it is illegal, irrelevant, immaterial, it is highly prejudicial; there is no testimony in this case, if there is, in fact, some substance for the question, which we don’t accept. That is not a proper matter to be brought up in this case, and it’s illegal, irrelevant and immaterial and highly prejudicial, and relating in no way to the issues involved here.
“BY THE COURT: Overrule the objection.
“MR. GRAHAM: We except.
“A. I’d say the same thing, that there would have to be some good reason for them being there.
“MR. PATTON: All right, sir, I believe that’s all.”
Appellee responds by saying in effect that the inquiries by the State on cross-examination of the character witnesses were proper upon the basis, as set forth in Gamble, McElroy’s Alabama Evidence, § 27.01(5)(1977) that the State was “testing the credibility” of the character witnesses. However, as is to be observed from the above quotation from the transcript, the witnesses were not interrogated as to whether they had “heard reports, rumors or statements derogatory of the accused,” which is the language of the particular cross-examination considered proper in Gamble, McElroy’s Alabama Evidence, supra. The questions were hypothesized, not upon reports, rumors, or statements by others, but upon the assumed actual existence of such disreputable conduct. We have no doubt that by this process of cross-examination the State was able, whether intentionally or not, to cause the jury to believe that the interrogator for the prosecution thought, whether correctly or not, that defendant had been guilty of the criminal or disreputable conduct referred to in the questions. In our opinion, reversible error was committed in overruling defendant’s objections to such questions by the *201 State on cross-examination of defendant’s character witnesses as to criminal conduct or misdeeds unrelated to the charge for which he was being tried.
Two or more issues in addition to those that have been discussed above are presented by appellant and discussed to some extent in the brief of each party. We find it unnecessary to determine such issues at this time, as the case should be reversed for reasons stated above and probably the other issues presented will not be involved on another trial of the case.
There was error prejudicial to defendant in the rulings adverse tó defendant whereby the State was able to communicate to the jury information tending to show that the prosecution had information tending to show that defendant had been guilty of criminal and disreputable conduct in addition to the crime of attempted murder for which he was being tried.
The judgment of the trial court should be reversed and the cause remanded for another trial.
The foregoing opinion was prepared by Retired Circuit Judge LEIGH M. CLARK, serving as a judge of this Court under the provisions of § 6.10 of the Judicial Article (Constitutional Amendment No. 328); his opinion is hereby adopted as that of the Court.
REVERSED AND REMANDED.
All the Judges' concur.